

12-16-2014
FILED
DEC 1 6 2014
Judge Charles P. Kocoras
United States District Court

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA

v.

TRI STATE METAL COMPANY INC.

14 CR 712
Judge Charles P. Kocoras

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, ZACHARY T. FARDON, and defendant TRI STATE METAL COMPANY INC., and its attorneys, ROYAL B. MARTIN and LEIGH D. ROADMAN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The parties to this Agreement have agreed upon the following:

## Charges in This Case

1.    The information in this case charges defendant with impairing and impeding the Internal Revenue Service in violation of Title 26, United States Code, Section 7212(a) and aggravated structuring in violation of Title 31, United States Code, Section 5324(a)(3).

2014 DEC 16 PM 3: 29

2.    Defendant fully understands the nature and elements of the crimes with which it has been charged. Defendant has been represented by counsel and acknowledges that counsel has advised it of the nature of the charges, possible defenses to the charges, and the nature and range of possible sentences.

### Charges to Which Defendant Is Pleading Guilty

3.    By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following counts of the information: Count One, which charges defendant with impairing and impeding the Internal Revenue Service in violation of Title 26, United States Code, Section 7212(a); and Count Two, which charges defendant with aggravated structuring, in violation of Title 31, United States Code, Section 5324(a)(3). In addition, as further provided below, defendant agrees to the entry of a forfeiture judgment.

### Factual Basis

4.    Defendant will plead guilty because it is in fact guilty of the charges contained in Counts One and Two of the information. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt, and establish a basis for forfeiture of the property described elsewhere in this Plea Agreement:

### a.  Impairing and Impeding the IRS

With respect to Count One of the information:  Beginning no later than approximately September 2008 and continuing through approximately September 2012,  TRI STATE METAL COMPANY INC. corruptly obstructed and impeded, and endeavored to obstruct and impede, the Internal Revenue Service in the due administration of Title 26, United States Code, namely, the correct identification and reporting of income, and the assessment and collection of income taxes, penalties, and interest due the United States.

More specifically, TRI STATE METAL COMPANY INC. was a business located in Chicago, Illinois that engaged in the purchase and sale of scrap metal.  Individual A was the owner and president of  TRI STATE.  TRI STATE established and maintained bank accounts in its name, including account number XXXXXX1066 at North Shore Community Bank, and account number XXXXXX0160 at Park National Bank.  Beginning no later than approximately September 2008, and continuing through approximately September 2012,  TRI STATE METAL purchased scrap metal from individuals and entities, and sold scrap to other businesses including Business A, a scrap metal company located in Chicago, Illinois.  Business A paid TRI STATE with checks issued from Business A's account at Bank of America.

Beginning no later than September 2008 and continuing through September 2012, TRI STATE also maintained a relationship with Business B, a currency exchange located in Chicago, Illinois that was a domestic financial institution engaged in the business of cashing checks for individuals and entities.

Beginning no later than September 2008 and continuing through September 2012, TRI STATE undertook a series of business practices in the effort to obstruct and impede the IRS's assessment and collection of income taxes due the United States. To effectuate its efforts at obstruction, TRI STATE used checks payable to fictitious individuals and negotiated those checks at Business B in order to generate cash to pay vendors, employees, and Individual A. TRI STATE utilized the cash payments, fictitious payee checks, as well as altered, false, and incomplete business records, to assist its employees, as well as individuals and businesses who sold scrap to TRI STATE, to understate their income on annual federal income tax returns, and conceal this income from the IRS.

### Fictitious Checks from Business A

Between approximately September 2008 and continuing through approximately September 2012, TRI STATE agreed with the principals of Business A to sell scrap metal to Business A in return for checks issued in

4

the name of fictitious payees. Between September 2008 and September 2012, Business A purchased scrap metal from TRI STATE and paid for this scrap metal with approximately 769 checks totaling approximately $4,170,907, all drawn on Business A's bank account at Bank of America, all made payable to fictitious individuals, and all in amounts less than $10,000. Despite having a business bank account, TRI STATE negotiated the 769 fictitious payee checks issued by Business A at Business B, for the purpose of paying TRI STATE's employees and suppliers in cash, and concealing these payments from the IRS. TRI STATE purposefully did not record either the sales or the receipt of funds from Business A on the books of TRI STATE, in order to conceal the transactions and cash payments from the IRS. Business B allowed TRI STATE to negotiate checks in the names of fictitious payees, which enabled TRI STATE to generate cash, and to conceal the cash and the true nature of the transactions.

### *Fictitious Checks from TRI STATE*

In addition to the cash TRI STATE generated by taking and negotiating fictitious payee checks from Business A, TRI STATE also sought to generate additional cash by issuing fictitious payee checks from TRI STATE's own business bank account. Beginning approximately September 2008, and continuing through approximately September 2012, TRI STATE

issued approximately 677 checks totaling approximately $6,419,419 from TRI STATE's bank account at North Shore Community Bank. All 677 checks were made payable to fictitious individuals, all in amounts totaling less than $10,000. TRI STATE purposefully listed the fictitious payees as suppliers in its books and records so that TRI STATE could conceal the true recipients of the cash generated by these fictitious payee checks from the IRS, and at the same time, allow TRI STATE to deduct the payments as a cost of goods on its own corporate tax return. TRI STATE used the cash generated by these fictitious payee checks to pay suppliers and others, as well as to conceal the actual recipients of these funds from the IRS.

### Currency Exchange

Beginning no later than approximately September 2008, and continuing through approximately September 2012, by pre-arrangement, on multiple dates on a weekly basis, Individual A, or another TRI STATE employee at Individual A's direction, contacted Business B and described the amount of cash that TRI STATE needed that day. Shortly thereafter, Individual A or an agent of TRI STATE delivered multiple fictitious payee checks in amounts less than $10,000 to the currency exchange, and received the corresponding amount of cash in the total amount requested. Between approximately September 2008 and September 2012, TRI STATE cashed at

6

Business B approximately $4,170,907 in fictitious payee checks issued by Business A to TRI STATE, and cashed approximately $6,419,419 in fictitious payee checks drawn on TRI STATE's bank account. All of the fictitious payee checks were issued in individual amounts of less than $10,000.

### *Employees*

TRI STATE also engaged in a practice of paying its employees' wages with a portion in cash and a portion in the form of a check. TRI STATE only reported the check portion of the employee wages to the IRS, and filed false documents with the IRS to conceal the cash portion of the wages and to evade the employer's portion of taxes owed on the cash wages.

As an employer, TRI STATE was responsible for accurately reporting the total amount of wages paid to its employees, and withholding required amounts of taxes including FICA taxes and Medicare withholdings. Between September 2008 and September 2012, TRI STATE paid its employees approximately $1,471,600 in cash wages that it did not report to the IRS, and did not withhold the required amounts including FICA taxes and Medicare withholdings on these cash wages. In addition to not withholding the required amounts, on a quarterly basis, TRI STATE filed false Employer's Federal Tax Returns (Form 941) with the IRS reporting only the check portion of the wages. On a yearly basis TRI STATE created false Forms W2,

reporting only the check portion of the wages, and sent these false Forms W2 to its employees and the IRS. Based upon the above conduct, the federal tax loss is approximately $210,439.

### Individual A

TRI STATE used the fictitious payee checks to provide an unreported source of income to Individual A, the owner and president of TRI STATE, and to provide him with approximately $840,720 of in cash for his personal benefit. TRI STATE further attempted to conceal this unreported income from the IRS by omitting from the books and records of the business any entries that would account for or document the funds provided to Individual A.

### Suppliers

TRI STATE agreed to pay certain individuals and entities who supplied TRI STATE with scrap metal in the form of both cash and check. In those instances, the supplier of scrap described the portion he wished to receive in cash and, thereafter, in order to conceal the cash portion of the payment from the IRS, a TRI STATE employee either altered weigh ticket records to reduce the price paid per pound, or issued multiple weigh tickets (one ticket for the portion paid with a check and a second ticket for the portion paid with cash). Between approximately September 2008 and September 2012, TRI STATE

paid approximately fifteen scrap metal vendors more than approximately $6,172,586 in cash with the understanding that the vendors would not report these payments to the IRS. This conduct resulted in an intended tax loss of approximately $1,728,324.

### Tri State's Corporate Tax Return

TRI STATE filed materially false federal corporate income tax returns (Forms 1120) for tax years 2009, 2010, and 2011, in which TRI STATE understated the company's gross receipts or sales to Business A and other sources by approximately $2,920,638.

On the 2009 return, TRI STATE failed to report approximately $691,663 of gross receipts or sales to Business A; on the 2010 return, TRI STATE failed to report approximately $1,164,369 of gross receipts or sales to Business A; and on the 2011 return, TRI STATE failed to report approximately $1,064,606 of gross receipts or sales to Business A. Based upon its failure to accurately report its gross receipts or sales, TRI STATE caused a federal tax loss in the amount of $370,468.

### b. Structuring

With respect to Count Two of the information: Beginning no later than September 2008 and continuing until approximately September 2012, in the Northern District of Illinois, defendant TRI STATE, for the

9

purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a) and the regulations prescribed thereunder, knowingly and intentionally structured and assisted in structuring approximately 1,400 transactions totaling approximately $10,590,326, with a domestic financial institution, namely, the currency exchange known as Business B.

Beginning no later than September 2008 and continuing until September 2012, TRI STATE utilized Business B to structure funds by making multiple cash withdrawals in amounts in excess of $10,000 by cashing checks made out to multiple fictitious payees in amounts that were individually less than $10,000, but that totaled more than $10,000, and cashing these fictitious payee checks on the same and consecutive days.

More specifically, TRI STATE entered into an arrangement with Business B by which on multiple days per week during each week of each year, Individual A or another TRI STATE employee at his direction, contacted Business B, described the amount of cash that TRI STATE needed, then delivered multiple fictitious payee checks to the currency exchange that totaled the amount of cash needed for the day plus an additional 1% fee for Business B. Upon receipt of the checks, an employee of Business B provided the TRI STATE employee with the corresponding amount of cash minus Business B's fee. Between approximately September 2008 and September

10

2012, TRI STATE cashed at Business B more than 1,400 fictitious payee checks issued in individual amounts of less than $10,000 totaling approximately $10,590,326, and after paying the currency exchange fee, received approximately $10,484,423 in cash.

Between September 2008 and September 2012, TRI STATE conducted, and directed others to conduct, approximately 769 cash withdrawals totaling approximately $4,170,907, using checks issued to fictitious payees from Business A's bank account at Bank of America, each check individually below the currency reporting requirement of $10,000 but totaling in aggregate more than $10,000 on the same or consecutive days.

Between September 2008 and September 2012, TRI STATE conducted, and directed others to conduct, approximately 677 cash withdrawals totaling $6,419,419 from TRI STATE accounts XXXXXX1066 and XXXXXX1060, just below the currency reporting requirement of $10,000. On average, approximately five sequentially numbered checks were cashed on the same day at Business B, all using fictitious payee names consisting of a first initial and last name, with each check issued for less than $10,000 but in total, aggregating more than $10,000.

TRI STATE intentionally structured and directed others to structure currency withdrawals at Business B in amounts less than $10,000 to cause

11

Business B and other financial institutions to fail to file a Currency Transaction Report.

## Maximum Statutory Penalties

5.      Defendant understands that the charges to which it is pleading guilty carry the following statutory penalties:

a.      Count One carries a maximum term of probation of five years and a fine in the amount of $500,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater.

b.      Count Two carries a maximum term of probation of five years and a fine in the amount of $1,000,000, or twice the gross gain or gross loss resulting from that offense, whichever is greater.

c.      In accord with **Title 18**, United States Code, Section 3013, defendant will be assessed $400 on each count to which it has pled guilty, in addition to any other penalty or restitution imposed.

Therefore, under the counts to which defendant is pleading guilty, the total maximum sentence is a fine in the amount of $1,500,000, or twice the gross gain or gross loss resulting from the offenses of conviction, whichever is greater, and special assessments totaling $800, in addition to any restitution ordered by the Court.

## Sentencing Guidelines Calculations

6.     Defendant understands that in imposing sentence the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, and that the Court must consider the Guidelines in determining a reasonable sentence.

7.     For purposes of calculating the Sentencing Guidelines, the **parties** agree on the following points:

a.     **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2014 Guidelines Manual.

b.     **Offense Level Calculations**.

**Count One**

i. The base offense level for Count One is 22, pursuant to Guidelines §§ 2T1.1(a)(1) and 2T4.1(I), because the tax loss of $2,309,231 is more than $1,000,000 but less than $2,500,000.

ii. The base offense level is increased by 2 levels because the offense involved sophisticated means, pursuant to Guideline § 2T1.1(b)(2).

13

**Count Two**

iii. The base offense level for Count Two is 26, pursuant to Guidelines §§ 2S1.3(a)(2), and 2B1.1(b)(1)(K), because the amount of money structured was approximately $10,590,326.

iv. The offense level is further increased by 2 levels pursuant to Guideline § 2S1.3(b)(1)(A), because the defendant knew or believed the funds were intended to promote illegal activity, namely tax evasion.

v. The offense level is further increased by 2 levels pursuant to Guideline § 2S1.3(b)(2), because the defendant committed the offense as part of a pattern of unlawful activity involving more than $100,000 in a 12-month period.

vi. The total offense level for Count Two is 30, pursuant to Guideline § 2S1.3(c)(1), because the resulting offense level for Count Two as calculated under the structuring guidelines is greater than as would be calculated under the appropriate guideline from Chapter Two, Part T (Offenses Involving Taxation).

### c. Application of Grouping Rules

Pursuant to Guideline § 3D1.2, Counts One and Two are grouped together into a single Group. Pursuant to Guideline § 3D1.3, the overall offense level is 30.

### d. Calculation of Fine

i. Pursuant to Guideline §§ 8C2.1, 8C2.4(a)(1) and 8C2.4(d), the base fine is $10,500,000.

ii. The starting point for the culpability score is 5, pursuant to Guideline § 8C2.5(a). This score is increased by 2 points pursuant to Guideline § 8C2.5(b)(4), because defendant had 50 employees and an individual within substantial authority personnel participated in and condoned the offense. This level is reduced by 2 points pursuant to Guideline § 8C2.5(g)(2), because the organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for the offense. Therefore, the total culpability score is 5.

iii. With a total culpability score of five, the Minimum Multiplier is 1.00 and the Maximum Multiplier is 2.00, pursuant to Guideline § 8C2.6.

iv. Pursuant to Guideline § 8C2.7, the minimum guideline fine is $10,500,000 and the anticipated maximum guideline fine is $21,000,000.

e.   Defendant and its attorney and the government acknowledge that the above guidelines calculations are preliminary in nature and based on facts known to the parties as of the time of this Agreement. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f.   Both parties expressly acknowledge that this Agreement is not governed by Fed. R. Crim. P. 11(c)(1)(B), that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing.   The parties may correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provision of the Guidelines. The validity of this Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw its plea, nor the government the right to vacate this Agreement, on the basis of such corrections.

16

## Cooperation

8.    Defendant agrees to fully and truthfully cooperate in any matter in which it is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing an employee or agent to provide complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil, or administrative proceeding.

## Agreements Relating to Sentencing

9.    Each party is free to recommend whatever sentence it deems appropriate.

10.    It is understood by the parties that the sentencing judge is neither a party to nor bound by this Agreement and may impose a sentence up to the maximum penalties as set forth above. Defendant further acknowledges that if the Court does not accept the sentencing recommendation of the parties, defendant will have no right to withdraw its guilty plea.

11.    Regarding restitution, defendant agrees pursuant to Title 18, United States Code, § 3663(a)(3) to the entry of an order requiring it to make restitution in the amount of $580,907 to the United States Treasury, which

17

reflects the amount of its unpaid federal income tax exclusive of penalties and interest, with credit for any funds prepaid prior to sentencing, for the charged conduct set forth in paragraph 4(a) above. Defendant understands that the amount of tax **loss as calculated** by the Internal Revenue Service may exceed the amount of **tax due as calculated for restitution** in the criminal case.

12. Restitution shall be due immediately, and paid pursuant to a schedule to be set by the Court at sentencing. Defendant acknowledges that pursuant to Title 18, United States Code, Section 3664(k), it is required to notify the Court and the United States Attorney's Office of any material change in economic circumstances that might affect its ability to pay restitution.

13. Defendant agrees to pay the special assessment of $800 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

## Forfeiture

14. The information charges that defendant is liable to the United States for approximately $1,976,335.34, which funds are subject to forfeiture because those funds constitute proceeds of structuring activity as alleged in Count Two. By entry of a guilty plea to Count Two of the information,

18

defendant acknowledges that the property identified above is subject to forfeiture.

15.    Defendant agrees to the entry of a forfeiture judgment in the amount of $1,976,335, in that these funds are subject to forfeiture. Prior to sentencing, defendant agrees to the entry of a preliminary order of forfeiture relinquishing any right of ownership it has in the above-described funds and further agrees to the seizure of these funds so that these funds may be disposed of according to law. Defendant understands that forfeiture of this property shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon defendant in addition to the forfeiture judgment.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Agreement

16.    This Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 14 CR 712.

17.    This Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver, or release by the United States or any of its agencies of any administrative or judicial civil claim, demand, or cause of action it may

have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state, or local prosecuting, administrative, or regulatory authorities, except as expressly set forth in this Agreement.

18.     Defendant understands that nothing in this Agreement shall limit the Internal Revenue Service in its collection of any taxes, interest or penalties from defendant.

### Waiver of Rights

19.     Defendant understands that by pleading guilty it surrenders certain rights, including the following:

**a. Right to be charged by indictment.** Defendant understands that it has a right to have the charges prosecuted by an indictment returned by a concurrence of twelve or more members of a grand jury consisting of not less than sixteen and not more than twenty-three members. By signing this Agreement, defendant knowingly waives its right to be prosecuted by indictment and to assert at trial or on appeal any defects or errors arising from the information, the information process, or the fact that it has been prosecuted by way of information.

**b.** **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against it, and if it does, it would have the right to a public and speedy trial.

i. The trial could be either **a jury** trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and its attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict it unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the information separately. The jury would have to agree

21

unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

        iv.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

        v.    At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and its attorney would be able to cross-examine them.

        vi.    At a trial, defendant could present witnesses and other evidence in its own behalf. If the witnesses for defendant would not appear voluntarily, it could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

        c.    **Appellate rights.** Defendant further understands it is waiving all appellate issues that might have been available if it had exercised its right to trial, and may only appeal the validity of this plea of guilty and the sentence imposed. Defendant understands that any appeal must be filed within 14 calendar days of the entry of the judgment of conviction.

d.     Defendant understands that by pleading guilty it is waiving all the rights set forth in the prior paragraphs, with the exception of the appellate rights specifically preserved above. Defendant's attorney has explained those rights to it, and the consequences of its waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

20.     Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope, and extent of defendant's conduct regarding the charges against it, and related matters. The government will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

21.     Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of its financial circumstances, including its recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis

for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of its sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

22.     For the purpose of monitoring defendant's compliance with its obligations to pay a fine and restitution during any term of supervised release or probation to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release or probation to which defendant is sentenced. Defendant also agrees that a certified copy of this Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

### Other Terms

23.     Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine and restitution for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

24.     Regarding matters relating to the Internal Revenue Service, defendant agrees as follows (nothing in this paragraph, however, precludes defendant from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS):

a.     Defendant agrees to cooperate with the Internal Revenue Service in any tax examination or audit of defendant and defendant's partnerships or corporations which directly or indirectly relates to or arises out of the course of conduct that defendant has acknowledged in this Agreement, by transmitting to the IRS original records or copies thereof, and any additional books and records that the IRS may request.

b.     Defendant will not object to a motion brought by the United States Attorney's Office for the entry of an order authorizing disclosure of documents, testimony and related investigative materials which may constitute grand jury material, preliminary to or in connection with any judicial proceeding, pursuant to Fed. R. Crim. P. 6(e)(3)(E)(i). In addition, defendant will not object to the government's solicitation of consent from third parties who provided records or other materials to the grand jury pursuant to grand jury subpoenas, to turn those materials over to the Civil Division of the United States Attorney's Office, or an appropriate federal or state agency (including but not limited to the Internal Revenue Service), for

use in civil or administrative proceedings or investigations, rather than returning them to the third parties for later summons or subpoena in connection with a civil or administrative proceeding involving, or investigation of, defendant or defendant's partnerships or corporations. Nothing in this paragraph or the preceding paragraph precludes defendant or defendant's partnerships or corporations from asserting any legal or factual defense to taxes, interest, and penalties that may be assessed by the IRS.

25.     Defendant acknowledges that it failed to file Corporate Federal Income Tax Returns for Calendar years 2012 and 2013. No tax liability has been determined at this time for those tax years. Defendant further agrees to file true, complete and accurate federal income tax returns for TRI STATE on or before the date of sentencing. The United States agrees not to seek any criminal charges regarding the failure to timely file these returns, however, it does not limit the Internal Revenue Service from the assessment of any fines, interest or penalties for defendants to timely file any returns in those years.

## Conclusion

26.     Defendant understands that this Agreement will be filed with the Court, will become a matter of public record, and may be disclosed to any person.

27.    Defendant understands that its compliance with each part of this Agreement extends throughout the period of his sentence, and failure to abide by any term of the Agreement is a violation of the Agreement. Defendant further understands that in the event it violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

28.    Should the judge refuse to accept defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound to it.

27

29.    Defendant and its attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Agreement, to cause defendant to plead guilty.

30.    Defendant acknowledges that it has read this Agreement and carefully reviewed each provision with its attorney. Defendant further acknowledges that it understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: ___Dec 16, 2014___


___Zachary T. Fardon by JBP___
ZACHARY T. FARDON
United States Attorney

___Leigh D. Roadman___
TRI STATE METAL COMPANY INC.
Defendant


___Patrick J. King JR.___
PATRICK J. KING, JR.
Assistant U.S. Attorney

___Royal B. Martin___
ROYAL B. MARTIN
Attorney for Defendant

___Leigh D. Roadman___
LEIGH D. ROADMAN
Attorney for Defendant


28